Buster Ates, Jr., filed a complaint in the Escambia County Circuit Court against his employer, Winn-Dixie, Inc., of Montgomery, Alabama (Winn-Dixie), requesting workmen's compensation benefits.
Following an ore tenus proceeding, the trial court entered a judgment, which contained the following findings of fact and conclusions of law:
 "FINDINGS OF FACT
"1 . . . Buster Ates, Jr., . . . was . . . over the age of fifty-two (52) years at the time of the trial.
"2. Ates is a high school graduate with no college education, trade school training, or other special education or training. His entire work history consisted primarily of meat cutting for grocery stores and meat markets. He had been a meat cutter for more than thirty-three (33) years. At the time of his injury he had been employed with . . . Winn-Dixie . . . for over twenty-three (23) years. Initially, he was hired as a meat cutter, and then after approximately five (5) years, he was promoted to meat market manager, where he had served continuously for over twenty-one (21) years, except the lost time attributable to the injuries giving rise to this cause. [Ates] regularly supervised two to four people while he was the manager of the meat market.
"3. Prior to his job injuries giving rise to the above-styled cause, during his tenure of service with Winn-Dixie, he had an attendance record of approximately twenty-three years, during which he never missed work because of illness or injury. Mr. Ates testified that he was a good meat cutter, a career man, and had never been unemployed except for a short period of time between a job with a small grocery store, which closed, and locating another job. Prior to his injury, his intentions were to pursue his career and achieve retirement benefits at Winn-Dixie. Ates testified that he loved his job and believed that he was good at it.
"4. His duties at the time of his injury included cutting meat, as well as lifting, bending, stooping, and climbing in and *Page 793 
around the walk-in meat cooler within the market. This work included lifting of up to approximately one hundred pounds and working in unusually cold temperatures.
"5. On March 27, 1989, Ates began work at 6:00 a.m. and was on the job performing his duties when a milk delivery truck arrived. He assisted with the unloading of cases of milk from the truck. As he stood on the ground reaching overhead onto the truck, he attempted to pull on a case of milk that had fallen down and wedged, or lodged, between pallets and the other cases. As he 'jerked' on the case of milk to remove it, he felt a painful burning sensation down his neck. He proceeded to finish unloading the truck and attempted to perform his duties for the rest of the day. That evening his neck became more painful and limited in motion and has continuously troubled him since then and has led to serious medical problems and extreme limitations on his activities, as well as other complications.
". . . .
"7. [Ates's] injuries directly and proximately resulted from accidents arising out of and during the course and scope of his employment with Winn-Dixie.
". . . .
"10. Ates was able to perform, and did in fact perform, all of the duties of his job on a regular basis and in a satisfactory manner prior to March 27, 1989.
"11. The day after the injury, Ates was examined by his family physician, Dr. John Vanlandingham, of Flomaton, Alabama. After certain diagnostic studies, Dr. Vanlandingham referred Ates to Dr. Charles Talbert in Pensacola, Florida. Dr. Talbert ordered more diagnostic studies and diagnosed Ates's problem as a herniated disc in the cervical spine (C5-C6). Talbert attempted to treat the problem conservatively. Dr. Talbert testified that Ates did not seem to be a malingerer or over exaggerate his complaints. Ates returned to his job after approximately three weeks, and worked on an intermittent basis, as he was able to do so for approximately six (6) months. He experienced pain, which required that he use prescription medication. Ates was referred to Dr. Preston Daugherty in Mobile. He remained under the care and treatment of Dr. Daugherty from April 1989 until November 1989. Daugherty concurred with Talbert that surgery was indicated. Ates was then referred to a Dr. Henry Mostellar in Mobile. Ates then returned to Dr. Daugherty, who continued with conservative treatment, including therapy. Ates was then referred to Dr. Eugene Quindlen. At this time, Ates was still experiencing pain and was still taking medication. Ates then returned to the care of Dr. Daugherty, who admitted him to Springhill Memorial Hospital for further diagnostic evaluations, including CT scan, myelogram, and MRI. He was hospitalized for seven (7) days, after the initial testing caused complications, including a spinal fluid leak [and] severe headaches. Then Mr. Ates was referred back to Dr. Talbert in Pensacola, who performed surgery on the herniated disc at C5-6 on January 10, 1990. Surgery included bone graft from the iliac crest and fusion of the vertebral bodies of C5 and C6. After a period of convalescence following that surgery, Dr. Talbert returned Mr. Ates to medium level work on March 22, 1990, with limitations of not lifting more than fifty (50) pounds on a repetitive basis and twenty-five (25) to thirty (30) pounds on a frequent basis.
"12. Beginning in April 1990, [Ates] returned to work on a light or limited-duty basis. He attempted to work a few hours each day to build his endurance back to full-time. He continued to be in pain and took pain medication. Then, as he was attempting to pull a box of frozen fish from the walk-in food freezer, he stepped backwards into a puddle of water which had formed near the entrance of the freezer, and slipped and fell. This fall caused to topple over on him a rack with several shelves containing approximately three hundred (300) pounds of frozen fish. He then was taken to the emergency room at West Florida Hospital, whereupon X-rays were taken and an examination performed. He experienced back pain and additional soreness and pain from the fall, but no new fractures were detected.
"13. Ates again attempted to return to work on a flexible schedule, working reduced hours and light duty. He was still suffering *Page 794 
pain and taking pain medication. He remained under the care of Dr. Talbert and was still experiencing problems. Dr. Talbert ordered further studies, which showed an incomplete fusion at C5 and C6.
"14. On November 29, 1990, Ates again presented to Dr. John Vanlandingham. Dr. Vanlandingham stated that Ates complained of his hands and feet swelling. His hands would turn cold, and he would experience pain as he worked in the cold environment, such as a freezer or cooler, in handling frozen objects. There was purple discoloration. Dr. Vanlandingham determined that Ates had developed Raynaud's phenomenon or Raynaud's disease and referred him to Dr. Lorraine Flatt of Medical Center Clinic Pensacola, Florida, a specialist in rheumatology, which is a sub-specialty of internal medicine.
"15. By the time Dr. Flatt initially examined Ates on March 15, 1991, he had severe Raynaud's phenomenon of the hands. According to Dr. Flatt, from working in the cold as a meat cutter, he had developed very extensive ulcers on the fingers. In her opinion, Ates had developed the Raynaud's phenomenon as a symptom of an underlying collagen disease diagnosed as lupus. According to Dr. Flatt, these severe ulcers were obviously very painful, and the purple coloration and diminished circulation were symptoms demonstrated to Dr. Flatt, which lead to her conclusion. In her opinion, the work environment of Ates was not the cause of the disease but was making it worse, and she did not connect his neck injury to the lupus disease. Dr. Flatt further opined that Ates has systemic lupus, which is an autoimmune disease involving problems with the immune system and overproduction of antibodies, primarily to normal human tissue, so that the body is more vulnerable to disease and produces inflammation in the blood vessels. The doctor stated that other symptoms of the disease were muscle aches, pain, fatigue, and sensitivity to extreme temperatures. Dr. Flatt seemed to be of the opinion that stress can seem to aggravate or precipitate the onset of flare-ups in lupus patients. Dr. Flatt further testified that she does not think Mr. Ates is well enough to go back to work and [that] she does not expect to release him to go back to work in the foreseeable future. She state[d] that she is afraid to send him back to work because he will get worse. She restricts him from lifting, climbing, stooping, [and] bending and explains that he would not handle an eight (8) hour a day job. Moreover, Dr. Flatt declined to recommend a functional capacities evaluation because of the exertion required.
"16. As the condition of Ates worsened, Dr. Talbert referred him to Dr. Bruce Raymon, a neurosurgeon at Medical Center Clinic, Pensacola, Florida. Dr. Raymon performed further diagnostic studies and concluded that further surgery was indicated.
"17. Winn-Dixie refused to approve further surgery but, instead, referred him to a Dr. Troy Tippett, III, for a 'second opinion.' Dr. Tippett recommended therapy, but Ates had already attempted therapy and failed, and he testified that he could not endure such therapy.
"18. The court ordered Winn-Dixie to sponsor the surgery recommended by Dr. Raymon. Dr. Raymon performed a 'take-down' and 're-do' of the fusion on October 24, 1991. Again, bone was transplanted from the iliac crest to the vertebral bodies at C5 and 6. Moreover, metal devises were implanted in the cervical spine to stabilize the vertebral bodies in order to facilitate fusion. Dr. Raymon assigned to [Ates] a twelve (12%) percent permanent partial [disability] rating to the body as a whole as a result of this surgery, and this rating did not take into account the headaches and visual complaints complained of by [Ates]. Dr. Raymon assigned general limitations of limited lifting, bending, and stooping, and these limitations did not take into account the lupus condition. Dr. Raymon was of the opinion that the lupus was not caused by [Ates's] neck or back problems. However, Dr. Raymon agreed that injuries could sometimes precipitate the symptoms of lupus, although such would not be common. Dr. Raymon was of the opinion that [Ates] could return to work with the limitations which he had prescribed. However, he did not return [Ates] to work but prescribed a functional capacities evaluation to determine the limitations which should be prescribed. Dr. Raymon also testified that it *Page 795 
was a possibility that [Ates] would eventually require some additional surgery.
"19. Dr. Vanlandingham testifie[d] that Raynaud's is aggravated by cold temperatures and [that] people who have Raynaud's do not tolerate cold temperatures. He further explain[ed] that the Raynaud's disease is precipitated by the environmental factors of temperature. Dr. Vanlandingham further testifie[d] that lupus is a disease of unknown origin, but [that] it can be present in a dormant state or a state of remission. He further explain[ed] that if the patient has lupus, '. . . certainly we're aware that any form of stress, an illness, surgery, any form of stress can actually exacerbate the basic disease process. . . .'
"20. Buster Ates testified that the multiple injuries, multiple surgeries, complications from the surgeries, the spinal fluid leak, the process of switching him from doctor to doctor by Winn-Dixie, the pain medication, the pain itself, the uncertainty of his future, [and] the tremendous change in his lifestyle have altogether placed on him the heaviest burden of stress that he has ever endured in his life. He testified that all of this caused a flare-up of the lupus.
"21. Mr. Ates takes Prednisone for fatigue, Cardene for circulation, Corgard for rapid heart beat, Zanex for sleep, and Flexeril for rash. He believes that all of these symptoms are related to lupus flare-up because he never missed a day's work in his life for sickness or injury prior to the accident of March 27, 1989, which precipitated the progression of events leading to his present condition. He further testified that he had no symptoms of Raynaud's/Lupus before his accident and that no doctors ever told him the lupus was related to his accident.
"22. As of the time of the trial, Mr. Ates had not worked anywhere since his second surgery and had continued to follow the advice of his physicians concerning limitations of his activities. He could not pursue former hobbies, such as hunting and fishing, and could not perform any activities such as mowing the yard, maintaining a garden, or performing maintenance and repair on his home. Mr. Ates testified that he cannot perform his former job and [that] he does not know of any job that he can do. Some of Mr. Ates's testimony was corroborated by his wife, Doris Ates, who has been married to him and lived with him for more than thirty years.
"23. Winn-Dixie's vocational expert, Mr. James A. Saxon, Jr., did not recommend that Mr. Ates return to work. Mr. Saxon did not contradict the recommendation of Dr. Flatt, who advised against returning Mr. Ates to any type of employment. He testified that [Ates] suffered a sixty-two (62%) percent to eighty-one (81%) percent vocational disability as a result of neck/back injuries, which did not include any consideration for problems associated with lupus.
"24. Mr. Ates's vocational expert, Mr. James N. Cowart, testified that he had performed vocational testing on Mr. Ates and had determined that the test results were consistent with his work background. Mathematical skills were 9th or 10th grade levels, and spelling and reading were 7th or 8th grade level. Mr. Cowart further testified that based on his review of the medical depositions and other evidence offered at trial, he could not as a vocational rehabilitation counselor recommend Ates to an employer. He concludes that in his physical condition, Mr. Ates does not possess the ability to return to work. He further testified that [Ates] suffered a forty-five (45%) percent to fifty-five (55%) percent vocational disability from his neck/back injuries, which did not include any consideration for problems associated with Raynaud's/Lupus.
"25. At the trial, Mr. Ates testified that his condition had progressively worsened. He experienced pain in his neck and shoulders, persistent headaches, and fatigue. He was still taking several kinds of prescription medication. He could not sleep on a regular nightly basis. He was able to rest only a few hours at a time and take naps at various times during the day and night.
". . . .
"30. The court is especially impressed with the credibility of Mr. Ates. His physical appearance at trial, personal demeanor, voice inflection, forthrightness of responses on the witness stand, sincerity of expression, *Page 796 
congeniality, and modesty were observed carefully by the court in connection with the content of his testimony.
 "CONCLUSIONS OF LAW "Mr. Ates is suffering and is expected to suffer in the foreseeable future a continuous inability to perform his usual trade or business as a meat cutter, a vocation in which he has been engaged for approximately thirty-three (33) years. He is medically and vocationally unable to obtain reasonably gainful employment in alternative fields. His permanent total disability has resulted in a permanent and total loss of ability to earn.
 "The court is of the opinion that the initial job injury suffered by Ates on March 27, 1989, set into motion the natural progression of events directly and proximately causing his permanent total disability. Ex parte Price, 555 So.2d 1060
(Ala. 1989). These events included multiple surgeries, many diagnostic evaluations, one of which required further hospitalization, varied quantities and dosages of medications, career disappointment, and additional injuries upon limited resumption of job activities in April 1990. It appears that the physical and emotional trauma and pain protracted over a period of more than three (3) years had placed a remarkable burden of stress upon Ates by the time of the trial. The impact of injuries of March 1989 and April 1990, together with the extended medical treatment, aggravated the existing infirmity of Raynaud's syndrome and systemic lupus, resulting in a flare-up of the symptoms of the lupus disease. Mitchell Motor Co. v. Burrow, [37 Ala. App. 222,] 66 So.2d 198 ([Ala. Ct. App.] 1953). These injuries and consequential treatment thereof combined and concurred with the systemic lupus disease (accompanied by Raynaud's phenomenon) to produce the resulting condition of permanent total disability. Newman Bros. v. McDowell, 354 So.2d 1138 (Ala.Civ.App. [1977]), cert. denied, 354 So.2d 1142 (Ala. 1978). See also Blue Bell, Inc. v. Nichols, 479 So.2d 1264 (Ala.Civ.App. 1985). Accordingly, the workmen's compensation statutes are liberally construed in this case to accomplish their beneficent purposes, and doubts must be resolved in favor of the employee. Scott Paper Co. v. Smith, 600 So.2d 269 (Ala.Civ.App. 1992)."
The trial court awarded Ates compensation benefits accordingly.
Winn-Dixie appeals, contending that no reasonable view of the evidence supports the trial court's findings and that the trial court's finding of a permanent total disability is clearly erroneous.
Winn-Dixie does not dispute that Ates suffered two on-the-job injuries. It contends, however, that none of the evidence presented supports the trial court's conclusion that Ates's lupus disease should be considered in the disability award. It argues that the trial court's judgment should be reversed because no medical evidence was presented at the trial that Ates's accident either caused lupus or precipitated a "flare up" of the disease.
The standard of appellate review in workmen's compensation cases is a two-step process. This court must first look to see if there is any legal evidence to support the trial court's findings. If such evidence is found, then we must determine whether any reasonable view of that evidence supports the trial court's judgment. Ex parte Eastwood Foods,575 So.2d 91 (Ala. 1991).
The trial court, as the finder of facts, is authorized to draw any reasonable inference from the evidence, including conclusions of medical facts that are not within the peculiar knowledge of medical experts. Ex parte Price, 555 So.2d 1060
(Ala. 1989). It is in the overall substance of the evidence, when viewed in its full context, that the test for medical causation finds its application. Price.
As quoted in Price, Professor Larson states the following regarding medical testimony:
"To appraise the true degree of indispensability which should be accorded medical testimony, it is first necessary to dispel the misconception that valid awards can stand only if accompanied by a definite medical diagnosis. True, in many instances it may be impossible to form a judgment on the relation *Page 797 
of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is. But this is not invariably so. In appropriate circumstances, awards may be made when medical evidence on these matters is inconclusive, indecisive, fragmentary, inconsistent, or even nonexistent."
2B A. Larson, The Law of Workmen's Compensation § 79.51(a), at p. 15-426.128 (1989).
The trial court in the instant case found that the initial job injury suffered by Ates on March 21, 1989, set into motion the progression of events, including multiple surgeries and additional injuries, which directly and proximately caused his permanent and total disability, resulting in a permanent and total loss of ability to earn.
Each side at trial offered, through expert testimony, an opinion as to Ates's ability to return to work. In determining the extent of disability, the trial court must review all the evidence and make its own observations.Fontaine Trailer Co. v. Hurt, 607 So.2d 265 (Ala.Civ.App. 1992). Where oral testimony conflicts regarding the extent of an employee's disability, the trial court's findings are conclusive if there is testimony to support those findings.Fontaine. An expert's opinion as to the percentage of disability is not binding upon the trial court in workmen's compensation cases. Blue Bell, Inc. v. Nichols, 479 So.2d 1264
(Ala.Civ.App. 1985).
We commend the trial court for providing this court with a thorough and well-reasoned final judgment, which complies in all respects with § 25-5-88, Code 1975. Given the medical uncertainty surrounding the cause of lupus, we find that the record clearly reflects legal evidence to support the trial court's findings in this case. We hold that a reasonable view of that evidence supports the trial court's judgment, which is due to be affirmed.
AFFIRMED.
THIGPEN and YATES, JJ., concur.